FRANK A. HALL, Respondent, *v.* THE STERLING IRON AND RAILWAY COMPANY, Appellant.

*Right to draw water enough for a certain purpose — when such purpose is a measure of quantity and not a limitation of use — extent of a grant, how determined.*

Where the right of using or drawing off water from a pond is granted (for the purpose of carrying on certain works of the grantee) in such quantity as would be sufficient to carry on such works, and no further or greater quantity, the works of the grantee are intended as the measure of quantity, and not to limit the purpose to which the use of the water can be applied; when, however, the intention of the parties to restrict the use is evident from the instrument or from the surrounding facts and circumstances such intention must prevail.

The extent of a privilege secured by a conveyance is to be measured and circumscribed by the terms of the instrument construed in the light of the legal principles applicable thereto, and the facts surrounding the parties at the time of the grant.

APPEAL by the defendant, The Sterling Iron and Railway Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Orange on the 10th day of September, 1892, upon the decision of the court after a trial at the Orange County Special Term, and also from an order made at the Dutchess County Special Term, and entered in the office of the clerk of the county of Orange on the 17th day of October, 1891, granting the plaintiff's motion for a preliminary injunction.

*William B. Anderson* and *Macgrane Cox*, for the appellant.

*E. A. Brewster*, for the respondent.

DYKMAN, J. :

This is an action in equity brought to restrain the defendant from placing any obstruction in or near the outlet of a certain pond called Mount Bashan pond, in Orange county, or the stream of water leading therefrom, and from doing any act whatever which shall diminish or interfere with the free flow of the water from the pond through its outlet, and from interfering with or molesting the plaintiff in removing the obstructions in the flume at the outlet of the pond.

The foundation of the plaintiff's claim is a deed from Peter Townsend and wife to Henry McFarlan, dated June 25, 1811, which conveyed " all that the right, title or privilege of using or drawing off the water from a certain pond called Mount Bashan pond, situate in the town of Monroe, in the county of Orange, near the nail manufactory of the said Henry McFarlan and others, called the Monroe Works, for the purpose of carrying on the said works, in such quantity as would be sufficient for carrying on and working the furnace situate between said nail manufactory and the said pond, called Southfield Furnace, occupied and owned by the said Peter Townsend and others, and for which purpose said water is now used, and no further or greater quantity.

" Provided always that the right so as aforesaid granted to the said Henry McFarlan, his heirs and assigns, of drawing off said water as aforesaid, shall cease at all times whenever the said furnace, called the Southfield Furnace, is in blast or making iron."

At the date of that deed Henry McFarlan and Joseph Blackwell owned and occupied about fifty-two acres of land, which included the premises now owned by the plaintiff, and also the seat of the old nail factory or Monroe Works.

The right to draw off the water of Mount Bashan pond was purchased with the joint funds of Henry McFarlan and Joseph Blackwell, but the deed was taken in the name of Henry McFarlan.

The plaintiff is now the owner of the land upon which the mill stands, and also of the right to the water of Mount Bashan pond, as conveyed to Henry McFarlan by deed from Peter Townsend of June, 1811.

The factory known as the Monroe Works was destroyed by fire many years ago and never rebuilt, but the water privilege in question has been used since that time to propel machinery upon the site where the plaintiff's factory for manufacturing wooden ware is located. The plaintiff acquired the title in April, 1886, and his deed includes the land and the water right.

The case was tried before a judge without a jury, who rendered a judgment in favor of the plaintiff for the relief demanded in the complaint, from which defendant has appealed to this court.

The trial judge found the following facts: That ever since April 1, 1886, the plaintiff had been seized in fee and possessed of the land and water power described in the complaint, which is the same as that described in the deed in the language which we have quoted, and that there was a natural stream of water leading from Mount Bashan lake to the Ramapo river, passing through the plaintiff's land, and which furnishes a water power propelling the machinery of a factory owned and operated by the plaintiff upon his said lands.

On June 25, 1811, the lands now owned by the plaintiff were owned and possessed by one Henry McFarlan and Joseph Blackwell, who were partners in business, and who, with their joint funds, purchased the water right mentioned in the deed from which we have taken the extract as already mentioned, the deed for the same being taken in the name of said Henry McFarlan alone. That land formed a part of a larger tract then owned and possessed by said McFarlan and Blackwell, upon which, below the place where plaintiff's factory stands, on the same property and upon the same stream, there was a nail factory, sometimes called Monroe Works, which was destroyed by fire more than fifty years ago, and never rebuilt.

That on June 25, 1811, one Peter Townsend owned Mount Bashan lake and the lands between the plaintiff's premises and that lake, and also owned the Southfield Furnace, and on that day he executed and delivered to said Henry McFarlan the deed already mentioned.

The plaintiff's title to the lands now owned by him is derived through sundry mesne conveyances from the said McFarlan and Blackwell after said deed to McFarlan, and the title to said water power granted by said deed, has, by said conveyances, and as an appurtenance to the land, become, and is now, vested in the plaintiff.

At the place where the plaintiff's factory now is, there existed, down to about the year 1865, an old grist mill run by the same water power. At or about that date the grist mill was converted into a basket factory, which afterward gave place to a shoddy mill, and then to the plaintiff's present factory, all of which were operated by the water power of said stream.

In September, 1891, the defendant, by closing the gate in a dam upon said stream above plaintiff's property, and by forbidding and preventing the plaintiff from opening the outlet of the lake, deprived the plaintiff of said water power to a considerable and material extent, so that the plaintiff from September 25, 1891, to November 16, 1892, could only run his machinery about one-quarter of the time, and the plaintiff sustained damage thereby.

The Southfield Furnace has not been in blast or operation since the year 1887. As conclusion of law, the trial judge found that the plaintiff is the owner of the right to use the natural flow of said stream for the purpose of propelling machinery upon his said premises. That in addition thereto, the plaintiff is also entitled, when the Southfield Furnace is not in blast, to draw off from Mount Bashan lake into said stream such quantity of water from time to time, as would be sufficient for the carrying on of the works of the Southfield Furnace, if in blast and operated only by water power, the water so drawn off from said lake to be sufficient to propel machinery on plaintiff's premises.

The plaintiff is entitled to an injunction restraining the defendant from interfering with the plaintiff's right above mentioned. Plaintiff is entitled to judgment for such injunction and establishing his rights aforesaid, and for six cents damages and costs of the action.

A brief description of the topography of the premises in question and of the pond is as follows: Mount Bashan pond is a lake about one square mile in extent, fed by springs and surface waters, situated in the town of Monroe, about four miles from the village of Southfield, in the town of Tuxedo.

At the northeasterly end of the lake is a dam through which flows the Mount Bashan creek, which is the only outlet of the pond. That stream flows in a general southerly direction to its junction with the Ramapo river at the village of Southfield. At a point on that stream, about three miles southerly from the pond, is a pond of about

fifty acres in extent, known as the Little Dam pond ; about a half mile further south on the stream is situated the Southfield Furnace, but from the diagram annexed to the case we see that the furnace was not located immediately upon the side of the stream, but was fed by water from the pond which led through a flume from the dam directly to the furnace. About a half mile south of the furnace on the stream is situated the mill of the plaintiff and a dam which he uses for the purpose of storing water for his mill. About 1,200 feet farther south from the plaintiff's mill and dam are the ruins of a building, which, as we gather, was the nail factory, known as the Monroe Works, mentioned in the complaint.

The difference between the parties is this : The defendant insists that the grant was made for the use of the nail works only, and that the waters cannot be utilized for any other purpose. It is also claimed by the defendant that the action cannot be maintained because the new factory of the plaintiff is not upon the site of the old nail factory.

Contrariwise the plaintiff claims that he is not restricted to the use of the water for a nail factory, but is entitled to use the same quantity of water for any purpose upon any part of his premises. The dispute must be settled by the terms of the grant and the law applicable thereto.

The substance of the grant is this : The right to use the water from Mount Bashan pond, for the purpose of carrying on the Monroe Works, in such quantity as would be sufficient for carrying on and working the Southfield Furnace, located between the factory of the plaintiff and the pond, and no further or greater quantity.

Like all rights resting in grant, the extent of the privilege secured by this conveyance is to be measured and circumscribed alone by the terms of the instrument, construed by the light of the legal principles applicable thereto and the facts surrounding the parties at the time of the grant.

In this State, if the grant be of sufficient water to propel certain machinery, the grantor may use the water for any purpose required, but no greater quantity than is granted, but it is otherwise where the use is restricted to a certain purpose. The question, therefore, must be referred to the intention of the parties, to be deduced from the language of the instrument, viewed in connection with the surrounding circumstances indicative of their object and purpose.

In this case there is nothing in the terms of the grant indicative of a design to restrict the grantee in the mode of using the quantity of water to which he was entitled.

Going back to the original grant of 1811, Peter Townsend, the grantor, was then the owner of the pond, the land between it and the plaintiff's factory and the Southfield Furnace, and it is easily inferred that he intended to reserve all the water power of the pond for his furnace, because he expressly provided in his grant that the right to draw off the water granted to Henry McFarlan should cease at all times whenever the furnace was in blast or making iron. By that proviso the grant became dormant and inoperative whenever the furnace was making iron, and conversely it was in full operation at all other times as an unrestricted grant.

Why should we indulge in the assumption that the grantor intended to restrict the use of the water to any particular purpose? Such restriction could in no way be beneficial to the grantor. He retained full control of the water for the use of his furnace whenever it was in operation. When the furnace was still, the quantity of water required to operate the machinery must run to the plaintiff's mill to be utilized there, and the purpose for which it was used was a matter of indifference to him.

In this State the courts have favored the construction of the terms of a grant of a sufficient quantity of water to propel a certain kind of machinery as used to indicate the quantity of water intended to be granted. This rule is based upon public policy, and the fact that it is more beneficial to the grantee without being more onerous to the grantor. Here the grant was of the right of using or drawing off the water from the pond for the purpose of carrying on the works of the grantee in such quantity as would be sufficient to carry on and work the furnace, and no further or greater quantity. Within all the decisions of this State the works of the parties are intended as the measure of quantity, and not as a restriction of the purpose to which the use of the water could be applied, and it may be used for the propulsion of any kind of machinery.

In the case of *Cromwell* v. *Selden* (3 N. Y. 253) the grant was of " water sufficient to keep a saw mill in operation at all times when there is more than is wanted to drive a grist mill with three run of stone and one set of carding machines and a fulling mill, and other

machinery for dressing cloth," and it was held that the grantor in the deed, and those holding under him, were not restricted in the use of the water to the particular object mentioned in the deed, but might use the quantity reserved for any other purpose.

In the case of *Olmsted* v. *Loomis* (9 N. Y. 423) it was held that a reservation in a grant of water privilege of so much water " as is necessary for the use of a forge and two blacksmiths' bellows," does not limit the use of the water reserved to the sole object specified, and such reference to a certain object will be regarded as a measure of the quantity and not as a restriction of the use of the water.

In *Wakely* v. *Davidson* (26 N. Y. 387) the language of the grant was this : " Also the privilege of water sufficient to carry the trip hammer in said blacksmith shop, when the same is not wanted by the parties of the first part, their heirs or assigns, for carding machines and fulling mill, said water to carry said trip hammer to be taken out to the best advantage," and it was held by the Court of Appeals that the language was not a limitation of the purpose to which the water was to be applied, but of the quantity to be taken, and that the quantity of water equal to that used at the time of the grant and reservation for carding and fulling may be used by those claiming under the grant and reservation for any other manufacturing purpose.

In *Comstock* v. *Johnson* (46 N. Y. 615) " the defendant's ancestor conveyed to the plaintiff's grantor certain real estate on which stood a carding machine and clothing works and shops, and also granted the privilege of drawing from their dam a sufficient quantity of water for the use of said works," and the Court of Appeals held that the words used in the grant under which the plaintiff held were to be taken as a measure of quantity, and did not limit the use of the water to the particular machinery specified.

In the case of *Mudge* v. *Salisbury* (110 N. Y. 413) the plaintiff was the owner of certain premises upon which, at the time he acquired title, there was a grist mill, and the premises were conveyed to him, " together with the grist mill privilege, being the first on the stream, for two run of stone, with the necessary apparatus for the same."

In an action to restrain the alleged interference with the water power it was held that the grant was not limited to power for the

grist mill as it stood at the time of the conveyance; that the privilege was made appurtenant to the land conveyed, and could be used either for the mill then standing or for any other erected on the land, or for any other purpose; that the reference to the machinery was not intended to limit the place where or the purpose for which the water could be used, but to measure and limit the quantity.

In the cases of *Groat* v. *Moak* (94 N. Y. 115); *Hartwell* v. *Mut. Life Insurance Company* (50 Hun, 498); *Fisk* v. *Wilber* (7 Barb. 395); *Terry* v. *Smith* (47 Hun, 334); *Olmsted* v. *Loomis* (6 Barb. 152), and *Borst* v. *Empie* (5 N. Y. 33) the decisions were all to the same effect.

While admitting substantially that the courts in this State and in the Eastern States, where the question has been many times considered with learning and ability, have held it to be for the interest of the public that the use of water power should be permitted to develop with the growth and changing interests of manufacture, the defendant yet insists that the general rule of construction based upon the doctrine of public policy is not applicable to this case.

The most that can be claimed from the authorities quoted by the appellant is, that where the intention of the parties to restrict the use is to be gathered from the instrument or from the surrounding facts and circumstances such intention must prevail.

That is simply stating in another way the rule which we have already recognized, but our conclusion is that neither the language of the grant in question nor the circumstances surrounding the parties at the time of its execution restricts the use of the water. Clearly a grant of water power may be so made as to restrict the use of the water to a particular purpose.

Our determination renders unnecessary an examination or decision of the question whether the rights of the plaintiff are appurtenant or in gross, for if they are in gross then he owns one-half, and maintains his action to protect his interests.

Moreover, the defendant has not raised the question of nonjoinder of parties.

The judgment should be affirmed, with costs.

PRATT, J., concurred; BARNARD, P. J., not sitting.

Judgment affirmed, with costs.